749 F.2d 331
 53 USLW 2315, 1984-2 Trade Cases 66,318
 STATE OF TENNESSEE ex rel. William M. LEECH, Jr., Attorney
General & Reporter, Plaintiff-Appellee,
v.
Elizabeth H. DOLE, in her official capacity as Secretary,
United States Department of Transportation; R. A. Barnhart,
in his official capacity as Administrator, Federal Highway
Administration, United States Department of Transportation;
and E.G. Oakley, in his official capacity as Division
Administrator, Federal Highway Administration, United States
Department of Transportation, Defendants-Appellants.
 No. 83-5499.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 20, 1984.
Decided Nov. 29, 1984.
 
 Anthony J. Steinmeyer (Lead), Douglas Letter (argued), Dept. of Justice Appellate Staff, Civ. Div., Kenneth N. Weinstein, U.S. Dept. of Trans., James R. Dann, Fed. Highway Admin., Washington, D.C., for defendants-appellants.
 William M. Leech, Jr., Atty. Gen. of Tenn., William J. Haynes, Jr., Sp. Deputy Atty. Gen., (Lead) (argued), Nashville, Tenn., for plaintiff-appellee.
 Before MERRITT and JONES, Circuit Judges, BELL, District Judge.*
 MERRITT, Circuit Judge.
 
 
 1
 This case is in effect a fight between the State of Tennessee and the United States over damages the State has recovered from bid riggers on federally funded road projects. Brought by the State against federal road officials for injunctive and declaratory relief, the principal questions are whether the relationship between the State as a federal grant recipient and its federal grantor is governed by the law of restitution or unjust enrichment under federal common law principles and whether jurisdiction of such issues resides exclusively in the Court of Claims, rather than the District Courts, under the Tucker Act. We hold that the State's claims to all the money recovered, though outside the Tucker Act, are contrary to applicable legal principles of unjust enrichment arising from benefits conferred by mistake; and we remand the case to the District Court to weigh the equities of the parties in order to determine the precise amount of the State's recovery owed as restitution to the federal government.
 
 I.
 
 2
 The process of federal highway construction funding proceeds through several stages. Congress authorizes a division of funds for each state according to a statutory formula. These funds are initially maintained in an account called an "unprogrammed balance account" administered by the Federal Highway Administration of the Department of Transportation. In order to draw on the account, the state must first have its highway program approved and then later have its plans for individual projects approved. Once a project is approved a bookkeeping entry is made shifting the funds into a project account. After the project is bid out by the state, federal road officials must approve the award of the bid. A project agreement is then executed with the state. The agreement obligates the government to reimburse the state for a share of the construction costs--usually ninety percent on interstate highway projects and seventy-five percent on most other projects. There are various rules regarding the lapse of unexpended funds, and in recent years the Secretary has imposed an inflation-fighting or a deficit-fighting ceiling on each state's expenditures in an amount less than the Congressional authorization. In 1982, for example, Congress authorized $171 million for Tennessee; but the Secretary's ceiling limited Tennessee to $144 million.
 
 
 3
 After the Justice Department obtained criminal convictions against approximately 70 firms and individuals for bid rigging on Tennessee road projects in violation of the Sherman Antitrust Act, the Tennessee Attorney General entered into settlements with some of the contractors for approximately $12 million. The State admits that a significant portion of this amount is attributable to the contribution of the federal government to state highway projects, although the record is unclear as to the exact amount of the settlements, the amount so far collected and the amount attributable to the federal contribution. The theory of the settlements is that the bid rigging contractors fixed the prices paid by the State on highway projects and that the State paid highway construction contract prices higher than the prices that otherwise would have prevailed. The federal officials would not have funded the projects, and the State would not have accepted the bids, had they known that the bid prices were the result of contractor collusion.
 
 
 4
 When the State initiated its investigation, antitrust Assistant Attorney General Litvack advised Tennessee Attorney General Leech that his office "had no interest in Tennessee's efforts to recover any over charges due to bid rigging on federal highway construction projects" and that Tennessee's efforts to recover "were matters for the State and its officials."
 
 
 5
 Despite these assurances from the Antitrust Division, in mid-1981, more than a year after the State investigation and settlement process had begun, federal highway officials wrote a series of letters addressed to various Tennessee officials, including the Commissioner of Transportation and the Attorney General, seeking information concerning settlements made for the purpose of determining how much of the settlement should be attributed to the federal share contributed to highway projects. The State officials in response consistently took the position that "we have researched the law in this matter," and "we cannot discern any legal basis" for the claim of the federal road officials that the federal government should "participate in the State antitrust settlement fund."
 
 
 6
 When State officials refused to give federal road officials the information they requested regarding the settlements, the federal officials computed from the information they had in their files a sum in excess of $4.5 million that they claimed must be set off against current highway funds allocated to the State of Tennessee, thereby reducing the State's funding on current projects. The federal officials took the position, however, that "the sums subtracted from the current billings"--the $4.5 million setoff--"can be restored to the unprogrammed balance" of funds for future highway construction projects in Tennessee.
 
 
 7
 The federal officials now take the position that this method of handling the $4.5 million setoff will have the effect of reducing current year federal highway funding for Tennessee road projects but will increase by precisely the same amount road funds for Tennessee's use in future years. The State disputes this contention. It claims that under the Highway Act the State will have to come up with approximately twenty-five percent in matching funds, or $1,200,000, in order to get the benefit in future years of the $4.5 million that will be taken by the setoff from the State's settlement funds. The State further contends that the $4.5 million setoff is expressly "subject to available obligation authority" and that it is unlikely that the State will actually receive the benefit of the $4.5 million credit in future years in light of the ceilings now being imposed. The record is unclear as to the actual effect, in dollars and cents, of the $4.5 million setoff against current funding because it is unclear how much of this money will be restored in future years.
 
 
 8
 A stalemate occurred in the negotiations between the parties, and the State filed this action in January, 1983. In its complaint the State claimed that the federal government is not entitled to any portion of the settlement fund and requested that the District Court enjoin the federal defendants from taking any administrative action to retrieve by setoff the federal share of such recoveries.
 
 
 9
 The defendants opposed the injunction on the grounds that the action is in effect a suit on a contract with the United States for more than $10,000 and that under the Tucker Act only the Court of Claims has jurisdiction of such contract actions. On the merits the defendants argued that federal policy and common law legal principles of restitution require that when a state recovers over-charges on federal aid highway projects, the federal share of the recovered sum must be credited back to the projects on which the over-charges occurred. The defendants argued that only by such a credit could the federal share of road construction programs be kept within statutory limits set out in the Highway Act, 23 U.S.C. Sec. 120, and that if the State keeps the entire recovery, it will be unjustly enriched by collecting this money twice, once from the federal government initially as a part of the project cost and then from the bid riggers in settlement of their over charges.
 
 
 10
 After concluding that the Tucker Act constituted no bar to its jurisdiction, the District Court held that once federal highway funds are apportioned to the states, or alternatively, once federal road officials approve a particular state project, the funds become state funds and are in the nature of outright "gifts" to the states in which the federal government no longer has a legal interest. The Court further held that the federal defendants have no statutory or other authority to set off or otherwise recover such "gifts" paid through mistake. Finally, as an alternative holding, the Court found that the government is equitably estopped from attempting to recover the federal share of the settlement funds because former antitrust Assistant Attorney General Litvack had denied a federal interest in the settlement efforts. 567 F.Supp. 704.
 
 
 11
 Accordingly, the District Court enjoined the federal defendants from setting off the federal share of the settlement fund against current billings.
 
 II.
 
 12
 The federal government argues that the District Court lacked jurisdiction because the Tucker Act, particularly 28 U.S.C. Sec. 1346(b) and 28 U.S.C. Sec. 1491(a)(2), vests exclusive jurisdiction over this suit in the Court of Claims.[1] While these provisions could well be read as precluding District Court jurisdiction over all claims not within the $10,000 limit that could have been brought in the Court of Claims under 28 U.S.C. Sec. 1491(a), such a literal reading of the substantive claims encompassed by that provision has long been rejected. Instead, "it is not every claim involving or invoking the Constitution, a federal statute or regulation which is cognizable in the Court of Claims." Eastport Steamship Corp. v. United States, 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967). Exclusive Court of Claims jurisdiction is limited to suits founded on contract involving more than $10,000. C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4101, at 210 (1978). This limitation is especially important in light of the 1976 amendments to 28 U.S.C. Sec. 1331(a), which eliminated the requirement of a specified amount in controversy as a prerequisite to the maintenance in District Court of an action "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub.L. No. 94-574, 90 Stat. 2721 (1976).[2] Interpreting this provision, the Supreme Court has observed:
 
 
 13
 The obvious effect of this modification, subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on Federal Courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate.
 
 
 14
 Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). In determining whether the Court of Claims has exclusive jurisdiction in this case, we must therefore "be careful not to subvert congressional objectives underlying the enactment of the judicial review statute by allowing the government to give an overly expansive scope to the notion of claim 'founded upon' a contract." C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4101, at 210-11 (1978).
 
 
 15
 The present case is not an action upon a contract for damages. It is rather an action for injunctive relief to prevent the defendants from carrying out a policy of deducting under a theory of unjust enrichment amounts previously paid to the State by mistake. The Court of Claims does not have exclusive jurisdiction over this suit, because although the federal government seeks to recoup its share of the State's recovery by refusing to honor vouchers submitted by the State, the main issues in the case sound in restitution, not contract. The Court of Claims does not have exclusive jurisdiction over a suit merely because it raises contract related issues. See B.K. Instrument, Inc. v. United States, 715 F.2d 713, 727 (2d Cir.1983) (action alleging that government contract was awarded in violation of statutory procedures); Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C.Cir.1982) (Court of Claims did not have exclusive jurisdiction over suit by government supplier seeking to enjoin Coast Guard from releasing to the public data on the product supplied). Aleutco v. United States, 244 F.2d 674, 678 (3rd Cir.1957) (District Court had jurisdiction over suit for conversion brought by a purchaser of surplus government materials when the Navy refused to release the goods). Courts have previously found jurisdictional authority under 28 U.S.C. Sec. 1331 to hear suits involving the legality of impoundment of highway funds, State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1105 (8th Cir.1973), and disbursement to state education agencies of federally provided funds, People Ex Rel Bakalis v. Weinberger, 368 F.Supp. 721, 723 (N.D.Ill.1973). The present suit is likewise clearly not "grounded in contract" and therefore not subject to exclusive Court of Claims jurisdiction.
 
 
 16
 Our decision that the District Court properly exercised jurisdiction over plaintiff's claim recognizes the policy of preserving the Tucker Act's limited and conditional waiver of sovereign immunity in contract actions. Indeed, as the Supreme Court emphasized in United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983), a claim is only cognizable under the Tucker Act if it is for money damages and is based on a source of substantive law mandating compensation by the Federal Government. It is doubtful, therefore, whether this suit could even be heard by the Court of Claims, as plaintiff seeks only declaratory and injunctive relief. While it is clear that a claimant may not avoid the exclusive jurisdiction of the Court of Claims merely by framing a complaint to seek nonmonetary relief when the result would be the equivalent of obtaining money damages, American Science & Engineering, Inc. v. Califano, 571 F.2d 58, 61-62 (1st Cir.1978), neither does the Court of Claims possess exclusive jurisdiction simply because a suit for nonmonetary relief may form the basis for a later money judgment. See Beller v. Middendorf, 632 F.2d 788, 799 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405, reh. denied, 454 U.S. 1069, 102 S.Ct. 621, 70 L.Ed.2d 605 (1981); Glines v. Wade, 586 F.2d 675, 681 (9th Cir.1978). District Court jurisdiction in the present case thus supports the Congressional policy of liberalized judicial review animating the 1976 amendments to Sec. 1331, while respecting the Court of Claims' special competence and experience in cases involving the interpretation and review of government contracts.
 
 III.
 
 17
 The federal common law is the source of the legal principles which govern the parties' claims in this action. The federal common law controls rights of recovery in disputes between the federal government and others arising from legal relationships created but not fully defined or delineated by federal constitutional and statutory law. See Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Friendly, In Praise of Erie--and of the New Federal Common Law, 39 N.Y.U.L.Rev. 383 (1964). The government's unjust enrichment claims based on benefits conferred by mistake under the Federal Highway Act and the State's rejection of such claims are governed, therefore, by federal common law.
 
 IV.
 
 18
 Under federal common law principles, the District Court was clearly mistaken in holding that the government cannot take advantage of the law of restitution to recover grant monies paid out through mistake. The federal share was not an outright "gift" with no strings attached. It was paid to the State for particular purposes subject to definite conditions. It contemplated construction contracts and valid competitive bidding.
 
 
 19
 The earlier federal cases on this subject involve contract carriers of mail, naval and other 19th Century defense contractor claims, and the claims of military officers. In Wisconsin Central R.R. Co. v. United States, 164 U.S. 190, 208-09, 211, 17 S.Ct. 45, 50-51, 41 L.Ed. 399 (1896), a mail contract case, Chief Justice Fuller reviews many of the older cases on government monies similarly paid through mistake. " 'Overpayments made at one time by mistake,' " he says, quoting earlier cases, can " 'be corrected and properly charged against credits coming in afterwards' "--unless " 'peculiar circumstances appear to make such recovery inequitable and unjust' " (citations omitted).
 
 
 20
 In Grand Trunk Western Ry. Co. v. United States, 252 U.S. 112, 120-21, 40 S.Ct. 309, 311-12, 64 L.Ed. 484 (1920), another mail case, Justice Brandeis, relying on the Wisconsin Central case, reiterates the point that "it was the duty of the Postmaster General to seek to recover [for] over payment[s]," and he "was at liberty to deduct the amount of the over payment from the monies otherwise payable...." See also United States v. Mead, 426 F.2d 118 (9th Cir.1970) (applying unjust enrichment principles arising from benefits conferred by mistake to government payment to farmer-contractor in farm conservation program).
 
 V.
 
 21
 The case below was tried on a basis inconsistent with general principles of restitution. The case was tried on an all-or-nothing basis--either the State is entitled to keep all the bid rigger money recovered or the federal officials are entitled to a full setoff and restitution of all of the federal share initially paid on the projects. In fact, principles of restitution are flexible, not rigid, as Chief Justice Fuller indicated in the Wisconsin Central case, supra. They take into account, as he said, the "peculiar circumstances" of the situation and often require the balancing of equities. Id. Although "[a]ccountability for benefit received is a core characteristic of restitution law," it is also true that "what constitutes a 'benefit' is at times a perplexing problem on which judgments may differ." RESTATEMENT 2D, RESTITUTION Sec. 1, Underlying Principles of Restitution, at 14, 23 (Tent.Draft No. 1, April', 1983). "[T]here is an independent principle that the receipt of gain is not unjust enrichment to the extent that the recipient generated it by his own rightful contribution of effort, capital or skill." Id. "In application, the principle [of benefit conferred through mistake] may require restitution of part of an amount paid, not the whole, and may require the correction rather than the avoidance of a transfer." Id. Sec. 5, at 58.
 
 
 22
 The record before us does not contain facts that would allow us to balance the equities of the situation. The record does not show the State's costs of recovery or the percentage of the recovery "generated" by the State's "own rightful contribution of effort, capital or skill." Id. Sec. 1, at 23. It does not show what percent of the setoff money, if any, the federal defendants will, in fact, return to the State in the future, i.e., the costs to the State of having the recovered money set off against current accounts but applied to future "unobligated" or "unprogrammed" accounts. Neither does it give us any basis to determine what percentage of the settlement money the State should be permitted to retain as an incentive to pursue on behalf of the federal government as well as itself and recover from bid riggers the federal as well as the state share of project costs. We, therefore, must remand the case to the District Court to weigh and balance the equities concerning the precise amount of the federal share the state should be permitted to retain and the precise amount it owes to the federal government as restitution. Until the District Court concludes this process, it may continue its injunction preserving the status quo in effect.
 
 VI.
 
 23
 It is clear that the doctrine of equitable estoppel--based in this case on the conversation between the State Attorney General and antitrust Assistant Attorney General Litvack--is no bar to recovery or setoff of the federal share by the defendants. In the first place, the equitable estoppel argument is misplaced here because Litvack did not specifically address the question of recovery of the federal share by federal road officials under the Highway Act. He was talking about federal recovery from the bid riggers under the antitrust laws. Even if this were not the case, "it is well settled that the government may not be estopped on the same terms as any other litigant." Heckler v. Community Health Services of Crawford County, Inc., --- U.S. ----, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). The doctrine of equitable estoppel does not apply here, just as it did not apply in Heckler, because the only "detriment" to the party asserting estoppel against the government is simply its "inability to retain money that it should never have received in the first place." Id. 104 S.Ct. at 2225. Not only must businessmen and administrators, as Justice Stevens reminds us in Heckler, quoting from Holmes, "turn square corners when they deal with the government," they may not bend the government's mistake into a windfall for themselves. Id. 104 S.Ct. at 2225 quoting from Rock Island R.R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). They may not use the government's error as an angle to enrich themselves.
 
 
 24
 Accordingly, the judgment of the District Court is reversed and the case remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Samuel H. Bell, Judge of the United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 28 U.S.C. Sec. 1346(a)(2) provides:
 (a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:
 ....
 (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States or for liquidated or unliquidated damages in cases not sounding in tort which are subject to sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.
 28 U.S.C. Sec. 1491(a)(1) provides in part:
 The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 
 
 [2]
 As further amended in 1980, Sec. 1331 now provides for federal court jurisdiction of "all civil actions arising under the Constitution, laws or treaties of the United States." (Pub.L. No. 96-486, 94 Stat. 2369), (1980)