HAHN, Michael S. and Bradley, B.
Shay and all other persons
similarly situated

v.

UNITED STATES of America,
Appellant.

No. 84–1007.

United States Court of Appeals,
Third Circuit.

Argued Nov. 26, 1984.

Decided March 18, 1985.

As Amended April 1, 1985.

Rehearing and Rehearing In Banc
Denied April 16, 1985.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Edward S.G. Dennis, Jr., U.S. Atty., Philadelphia, Pa., Anthony J. Steinmeyer, Richard A. Olderman (argued), Appellate Staff, Dept. of Justice Civil Div., Washington, D.C., for appellant.

Stuart J. Agins (argued), Robert B. Bodzin, Stephanie R. Whitlon, Mesirov, Gelman, Jaffee, Cramer & Jamieson, Philadelphia, Pa., for appellees.

Before ADAMS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This is an appeal from a final judgment of the district court for a plaintiff class consisting of persons who participated in the National Health Service Corps Scholarship Program prior to September 15, 1981 and who became or will become commissioned medical or dental officers of the Public Health Service after that date. The district court permanently enjoined the government from denying class members "constructive service credit" for their professional education in the calculation of their basic pay, ordered that class members receive constructive service credit retroactive to the date of their commissions, and awarded back pay. Because we find that the district court did not have jurisdiction over the plaintiffs' claims for monetary relief, and that it erred in concluding that plaintiffs were entitled to constructive service credit under applicable statutes, we will vacate the judgment of the district court.

## I.

The events giving rise to this litigation have unfolded before a somewhat complicated statutory backdrop. Thus, it will be helpful to first explore the relevant statutory scheme, and then the specific events leading to this appeal.

### A. *The Scholarship Program & Constructive Service Credit*

The National Health Service Corps (the "NHS Corps") was established within the Public Health Service of the Department of Health and Human Services "to improve the delivery of health services in health manpower shortage areas...." 42 U.S.C. § 254d(a)(2) (1982). To assure an adequate supply of trained physicians and dentists for the NHS Corps, Congress established the National Health Service Corps Scholarship Program (the "Scholarship Program"). 42 U.S.C. § 254*l*. Under the Scholarship Program, the Secretary of Health and Human Services (the "Secretary") provides scholarships to eligible students in professional health degree programs who, by written contract, agree to serve upon the completion of their training, a "period of obligated service" equal to one year for each year the student receives a scholarship, or a minimum of two years. 42 U.S.C. § 254*l*(f).

A scholarship recipient may meet his or her service obligation in a number of ways: (1) as a member of the NHS Corps, 42 U.S.C. § 254m(a); (2) in private practice in a health manpower shortage area, 42 U.S.C. § 254n; or (3) through service under a National Research Service Award, 42 U.S.C. § 254m(e). The NHS Corps consists of three categories of members: (1) commissioned officers of the Regular and Reserve Corps of the Public Health Service (the "PHS Commissioned Corps"); (2) civil-

ian employees of the United States; and (3) other individuals who are not employees of the United States. 42 U.S.C. § 254d(a)(1). The Public Health Service is considered a "uniformed service", 37 U.S.C. § 101(3), and therefore the compensation and benefits for officers of the PHS Commissioned Corps are governed by the same basic laws as for members of the armed forces. Compensation and benefits for civilian employees are governed by the civil service laws.

Prior to September 15, 1981, scholarship recipients who became medical or dental officers of the PHS Commissioned Corps were entitled to receive, in the calculation of their basic pay, "constructive service credit" of up to four years. "Constructive service credit is a way of recognizing time invested in additional preparation for professional status and is awarded to officers entering service when that advanced preparation, beyond the bachelor degree, is a prerequisite to his or her being appointed as an officer in a professional specialty." H.R.Rep. No. 1462, 96th Cong., 2d Sess. 37, *reprinted in* 1980 U.S.Code Cong. & Ad. News 6333, 6367. The Defense Officer Personnel Management Act of 1980, P.L. No. 96–513, 94 Stat. 2835 ("DOPMA"), as part of a major restructuring of the military pay system, and in recognition of other incentives that had previously been enacted, repealed the provision allowing medical and dental officers constructive service credit. DOPMA did, however, contain the following saving provision:

> Sec. 625. (a) The amendments made by this Act do not affect the crediting of years of service to any person who on the day before the effective date of this Act—
>
> (1) had been credited with years of service upon an original appointment as an officer or after such an appointment; or
>
> (2) was participating in a program leading to an appointment as an officer in the Army, Navy, Air Force, or Marine Corps and the crediting of years of service.

> (b)(1) Any officer who on the effective date of this Act is an officer of the Army or Navy in the Medical or Dental Corps of his armed force, an officer of the Air Force designated as a medical or dental officer, or an officer of the Public Health Service commissioned as a medical or dental officer is entitled to include in the years of service creditable to him for the computation of basic pay and retired pay the years of service creditable to him for such purposes under clauses (7) and (8) of section 205(a) of title 37, United States Code, as in effect on the day before the effective date of this Act.
>
> (2) Any person who on the day before the effective date of this Act was enrolled in the Uniformed Services University of the Health Sciences under chapter 104 of this title or the Armed Forces Health Professions Scholarship Program under chapter 105 of this title and who on or after the effective date of this Act graduates from such university or completes such program, as the case may be, and is appointed in one of the categories specified in paragraph (1) is entitled to include in the years of service creditable to him for the computation of basic pay and retired pay the years of service that would have been credited to him under clauses (7) and (8) of section 205(a) of title 37, United States Code, as in effect on the day before the effective date of this Act, had such clauses not been repealed by this Act.

94 Stat. at 2951–52. It is undisputed that the plaintiff class, all of whom were participants in the Scholarship Program prior to September 15, 1981, but who were not or will not be appointed officers of the PHS Commissioned Corps until after that date, are not within the express terms of this saving provision.

B. *This Lawsuit*

According to the affidavits and exhibits submitted on their motion for summary judgment, class representatives Michael S. Hahn and B. Shay Bradley became participants in the Scholarship Program in May of 1978, as they prepared to enter four-year

dental programs that fall. At that time officers of the PHS Commissioned Corps were still entitled to constructive service credit. Though the form contract they signed contained no provisions relating to compensation, each received a pamphlet stating that officers of the PHS Commissioned Corps would be entitled to constructive service credit. Each was advised by representatives of the NHS Corps, in on-campus meetings during 1980, that they would receive the four-year constructive service credit upon becoming officers of the PHS Commissioned Corps. On May 24, 1982, after he was appointed a dental officer in the PHS Commissioned Corps and more than eight months after the effective date of DOPMA, Hahn received a "Pay Information Fact Sheet" from the Public Health Service that stated that dental officers would receive four years constructive service credit for their professional education. Upon graduation from dental school in 1982, Hahn owed two years of obligated service and Bradley owed four years. Neither has received constructive service credit in the calculation of basic pay. Each alleges that as a result of the denial of constructive service credit, their annual basic pay is approximately $5,500 less than they would have otherwise received.

Hahn and Bradley filed this suit on November 18, 1982, on their behalf and on behalf of all others similarly situated, seeking declaratory, injunctive, and monetary relief. Their complaint was in three counts, the first two alleging that DOPMA's repeal of the constructive service credit violated the fifth amendment as applied to them in that it was impermissibly retroactive and that the saving provision was arbitrary and discriminatory. The third count alleged that the government breached its contract with the plaintiffs in denying them the constructive service credit they had expected to receive.

By order dated May 3, 1983 the district court certified a plaintiff class consisting of "[a]ll persons who were participants in the National Health Service Corps Scholarship Program prior to September 15, 1981, and who are or were commissioned medical or dental officers of the United States Public Health Service after September 15, 1981." Cross-motions for summary judgment were filed, and on November 7, 1983 the court entered judgment for the plaintiffs. In a memorandum opinion the district court, relying on the Supreme Court's reasoning in *United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d (1977), held that DOPMA did not contain a "sufficiently clear expression of congressional intent to divest plaintiffs of their earned service credit." Thus, the district court concluded, DOPMA did not affect plaintiffs' entitlement to constructive service credit.

In a final decree issued December 27, 1983 the district court permanently enjoined the government from denying class members constructive service credit, ordered that class members be given credit retroactive to the date of their commission, and awarded plaintiffs back pay in an amount "determined by calculating the difference between that which each person would have received had such person received the constructive service credit for purpose of determining basic pay, and the amount of pay actually received...." The government was ordered to prepare a list of class members and calculate the back pay due to them, though this order was stayed pending appeal.

## II.

The government contends that because under the "Tucker Act" the United States Claims Court is the exclusive forum for claims against the United States exceeding $10,000, the district court lacked jurisdiction to hear this case. We agree that the district court did not have power to award monetary relief, but conclude that plaintiffs' claims for injunctive and declaratory relief were properly before the district court.

██ The Tucker Act, as codified at 28 U.S.C. §§ 1346, 1491 (1982), gives the Claims Court jurisdiction over non-tort claims against the United States, and gives the district courts concurrent jurisdiction

over such claims not exceeding $10,000. It is uniformly held that, for claims exceeding $10,000, the Tucker Act vests *exclusive* jurisdiction in the Claims Court, *see, e.g., New Mexico v. Regan,* 745 F.2d 1318, 1322 (10th Cir.1984); *Zumerling v. Marsh,* 591 F.Supp. 537, 542 (W.D.Pa.1984), even if such claims could be brought within the terms of some other jurisdictional grant, such as 28 U.S.C. § 1331 (1982). *See Graham v. Henegar,* 640 F.2d 732, 734 (5th Cir.1981). This is because it is only under the terms of the Tucker Act that the United States waives its sovereign immunity to such claims, and this consent to suit is a jurisdictional prerequisite. *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983); 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3654, at 156–57 (1976). Comparing the language of sections 1346 and 1491, as set forth in the margin [1], demonstrates that it is not the nature of the cause of action that determines whether the district court or the Claims Court has jurisdiction—each is empowered to hear claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...." Rather, we must look to the nature of the relief requested.

In this case, however, the two inquiries are somewhat related, because in their complaint the plaintiffs made a separate prayer for relief under each alleged cause of action.

Counts I and II, alleging violations of the fifth amendment Due Process Clause, sought declaratory judgments that certain provisions of DOPMA were unconstitutional, injunctions against enforcement of those provisions, and monetary relief of an unspecified amount for lost wages, interest, and attorneys' fees. Count III, alleging breach of contract, sought only monetary relief "in an amount in excess of $10,000, together with interest, costs and attorneys' fees." We will consider first whether the district court had jurisdiction over the contract count and the monetary aspects of the constitutional counts, and second whether there was jurisdiction over the nonmonetary aspects of the constitutional claims.

■ *Monetary Claims.* The complaint alleged that the "amount in controversy" exceeded $10,000 and that the district court had jurisdiction pursuant to 28 U.S.C. § 1331, the general "federal question" provision. There was no allegation of Tucker Act jurisdiction. These allegations

---

**1.** 28 U.S.C. § 1491 (1982) provides in relevant part:

> (a)(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....
>
> (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States.

28 U.S.C. § 1346 (1982) provides in relevant part:

> (a) The district courts shall have original jurisdiction, concurrent with the United States Claims Court, of:

> . . . .
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States....

The Claims Court, established by the Federal Courts Improvement Act of 1982, P.L. No. 97–164, 96 Stat. 25, inherited the trial jurisdiction of the former Court of Claims. The appellate jurisdiction of the Court of Claims is now vested in the Court of Appeals for the Federal Circuit. *See generally* Petrowitz, *Federal Court Reform: The Federal Courts Improvement Act of 1982— and Beyond,* 32 Am.U.L.Rev. 543, 558–59 (1983).

are clearly not adequate to establish district court jurisdiction over the monetary claims. We do not, however, deem these deficiencies fatal. We may, on appeal, consider whether jurisdiction was proper on grounds—such as the Tucker Act—not asserted below. *See* 28 U.S.C. § 1653 (1982); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 68–72, 98 S.Ct. 2620, 2627–2630, 57 L.Ed.2d 595 (1978); *Eisler v. Stritzler*, 535 F.2d 148, 152–53 n. 3 (1st Cir.1976). (This is particularly appropriate where, as here, jurisdiction was not challenged prior to appeal. *See Norton v. Larney*, 266 U.S. 511, 516, 45 S.Ct. 145, 147, 69 L.Ed. 413 (1925).) And we do not consider the allegation that the "amount in controversy" exceeds $10,000 to be necessarily inconsistent with Tucker Act jurisdiction. This amount presumably includes the value of the declaratory and equitable relief sought as well as the monetary claims. *See generally* 14 C. Wright, A. Miller, E. Cooper, *supra*, § 3708. Nonetheless, we are unable to accept plaintiffs' contention, first advanced at oral argument, that the district court did in fact have jurisdiction under the Tucker Act.

■■■■ Though plaintiffs concede in their brief that "the record of the trial Court does not indicate the extent of plaintiffs' monetary claims," they now assert that as of the date the complaint was filed—indeed, even as of the date the district court entered judgment—their individual[2] monetary claims did not exceed $10,000. We need not decide which, if either, of these is

the relevant date for determining whether Tucker Act jurisdiction existed. In either case, plaintiffs' belated assertion cannot rescue their monetary claims, because it is inconsistent with the complaint we actually have before us. In their contract count, which sought only monetary relief, plaintiffs specifically requested a judgment in excess of $10,000. It is the practice of the federal courts to accept such good faith allegations in determining jurisdiction, so as to avoid examining the merits at a preliminary stage. *See* C. Wright, *The Law of Federal Courts* § 33, at 183 (4th ed. 1983). Plaintiffs ask us to, in effect, reverse this rule and look behind their allegations to determine by judicial notice that they were inaccurate. Though we are prepared to be generous in construing a complaint, so that jurisdiction is not lost due to faulty pleading, as an appellate court we cannot go beyond the face of the complaint, as well as the record, to impute allegations that contradict the complaint. *Cf. Norton v. Larney, supra,* 266 U.S. at 515–16, 45 S.Ct. at 147 (appellate court could sustain jurisdiction despite faulty pleadings where uncontradicted jurisdictional facts appear in the record, but not on the basis of "presumptions or argumentative inferences"). We can, however, remand with leave to amend the complaint to waive damages in excess of $10,000, *see Commonwealth of Pennsylvania v. National Association of Flood Insurers*, 520 F.2d 11, 25 (3d Cir.1975), as plaintiffs have indicated they may wish to do,[3] or to permit the district court to trans-

**2.** "[I]f the district court would otherwise have had jurisdiction over each class member's claim were such claim presented separately, Tucker Act jurisdiction would have been available even though when all individual claims were aggregated the total amount claimed exceeded one billion dollars." *Commonwealth of Pennsylvania v. National Association of Flood Insurers,* 520 F.2d 11, 25 (3d Cir.1975). *See also Zumerling v. Marsh,* 591 F.Supp. 537, 543 (W.D.Pa. 1984).

**3.** At oral argument, plaintiffs' counsel termed the question of waiver "academic". In a letter submitted to the court after argument, counsel stated that plaintiffs "*will* waive that portion of their back pay claims which were in excess of $10,000 at the time of the District Court's judg-

ment." (Emphasis added.) If plaintiffs have effectively waived claims in excess of $10,000, then appellate jurisdiction would reside exclusively with the Court of Appeals for the Federal Circuit. *See* 28 U.S.C. § 1295; *Oliveira v. United States,* 734 F.2d 760 (11th Cir.1984). Plaintiffs do not, however, question our authority to decide the merits of this appeal. In the absence of a reasonably unambiguous statement of plaintiffs' intentions, and noting further that "back pay" is not the only monetary relief sought by plaintiffs, *cf. Graham v. Henegar,* 640 F.2d 732, 735 (5th Cir.1981) (attorney's fees included in calculation of amount of Tucker Act claim), we do not reach the question of whether such a waiver may be made on appeal pursuant to 28 U.S.C. § 1653 (1982). Compare *Sheehan v. Army and Air Force Exchange Service,* 619

fer these claims to the Claims Court pursuant to 28 U.S.C. § 1631 (1982). We conclude that the district court was without power to grant monetary relief on plaintiffs' constitutional claims, or to hear the contractual claim that sought only monetary relief.[4]

■ *Nonmonetary Claims.* Plaintiffs' claims for declaratory and injunctive relief for the alleged constitutional violations raise somewhat different jurisdictional questions. We agree with plaintiffs that these fifth amendment claims are within the terms of the federal question jurisdictional grant of 28 U.S.C. § 1331, and that Administrative Procedure Act § 702[5] provides a corresponding waiver of sovereign immunity. *See Jaffee v. United States,* 592 F.2d 712 (3d Cir.), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). Our analysis cannot, however, stop there. This jurisdictional route may not be used to circumvent limitations on district

court jurisdiction created by the Tucker Act. *See Lee v. Blumenthal,* 588 F.2d 1281, 1283 (9th Cir.1979); *Estate of Watson v. Blumenthal,* 586 F.2d 925, 932–33 (2d Cir.1978). The government contends that such an end run is being attempted here, and that this entire suit belongs in the Claims Court. For the reasons set forth below, we disagree and conclude that the district court had jurisdiction over the nonmonetary claims.

■ The government urges us to adopt the rule that where the same facts giving rise to nonmonetary claims may also give rise to a subsequent suit in the Claims Court for monetary damages, a district court may not exercise jurisdiction over the nonmonetary claims. *See Keller v. Merit Systems Protection Board,* 679 F.2d 220, 222–23 (11th Cir.1982); *Carter v. Seamans,* 411 F.2d 767, 774–75 (5th Cir.1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).[6] These cases express a

F.2d 1132, 1137, n. 7 (5th Cir.1980) (permitting amendment), rev'd on other grounds, 456 U.S. 728, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982) with *McClendon v. Blount,* 452 F.2d 381, 383 (7th Cir.1971) (not allowing amendment).

4. The government has also argued that because the Tucker Act does not itself confer any substantive right to recovery against the United States, *see United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), and because, they contend, plaintiffs have not cited any law conferring such a right, neither the district court nor the Claims Court could have jurisdiction over the monetary claims regardless of the amount. Obviously, plaintiffs must state a cause of action upon which they may recover damages, but this is not a jurisdictional matter. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 70–72, 98 S.Ct. 2620, 2628–2630, 57 L.Ed.2d 595 (1978). It will be for the district court or the Claims Court to determine in the first instance whether plaintiffs have a cause of action for damages, subject—of course—to the binding effect of our decision today on the merits of several of plaintiffs' contentions.

5. 5 U.S.C. § 702 (1982):
    A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or

an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or implicitly forbids the relief which is sought.

6. The government also relies on *Chu v. Schweiker,* 690 F.2d 330 (2d Cir.1982) as a factually similar case adopting this rule. In *Chu* the plaintiffs were residents at a Public Health Service hospital that was closed down. The district court issued a declaratory judgment that plaintiffs had both a fifth amendment "property" interest in, and a contractual entitlement to, continuing their residency with the PHS, denied injunctive relief, and transferred their claims for damages, which exceeded $10,000, to the Court of Claims. The Court of Appeals reversed the declaratory judgment, stating: "[P]laintiffs'

concern that the preclusive effect of a district court determination of the nonmonetary claims would interfere with the Claims Court's exercise of its exclusive jurisdiction over the monetary claims. The Claims Court, however, does not share this concern, *Smith v. United States*, 654 F.2d 50, 52, 228 Ct.Cl. 168 (1981), nor do a majority of the Courts of Appeals that have considered this issue. *See Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 356 (6th Cir. 1984); *Minnesota by Noot v. Heckler*, 718 F.2d 852, 858 (8th Cir.1983); *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981); *Crawford v. Cushman*, 531 F.2d 1114, 1126 n. 17 (2d Cir.1976).[7] These courts hold that district court jurisdiction over a suit for nonmonetary relief is not foreclosed by the fact that it may later be the basis for an award of damages against the United States. We believe that this is the correct view of the matter. Determination of the nonmonetary claims may or may not determine whether plaintiffs are entitled to monetary relief, "and clearly will not determine the amount of such relief...." *Neal v. Secretary of the Navy*, 472 F.Supp. 763, 774 n. 22 (E.D.Pa.1979), *rev'd on other grounds*, 639 F.2d 1029 (3d Cir.1981).

Thus, we see no threat to Claims Court jurisdiction in the fact that collateral estoppel may require the Claims Court to adhere to a district court determination of the lawfulness of government conduct. Of course, Claims Court jurisdiction may not be evaded by merely disguising a monetary claim as a claim for an injunction requiring the payment of money. *See Hondros v. United States Civil Service Commission*, 720 F.2d 278, 299 N.40 (3d Cir.1983) (views

of Judge Seitz); *Tennessee ex rel. Leech v. Dole, supra,* 749 F.2d at 336; *New Mexico v. Regan, supra,* 745 F.2d at 1322; *Portsmouth Redevelopment and Housing Authority v. Pierce,* 706 F.2d 471, 474 (4th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Rowe v. United States,* 633 F.2d 799, 802 (9th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981); *Hoopa Valley Tribe v. United States,* 596 F.2d 435, 436, 219 Ct.Cl. 492 (1979). But this is not such a case. The injunctive relief sought by plaintiffs, though it *may* ultimately require expenditures from the public treasury, would *surely* have a significant effect on the deliberations of class members who, as of the time the injunction issued, had not yet decided whether to apply to become commissioned officers. *See* section III *infra*. For these same reasons, we cannot say on the basis of this record that this is a case where the equitable relief sought is moot, futile, or negligible in comparison with the money damages sought. *Cf. Hondros v. United States Civil Service Commission, supra,* 720 F.2d at 302–03 (Adams, J., concurring); *Minnesota by Noot v. Heckler, supra,* 718 F.2d at 859; *Cape Fox Corp. v. United States,* 646 F.2d 399, 402 (9th Cir. 1981); *Sellers v. Brown,* 633 F.2d 106, 108 (8th Cir.1980); *Polos v. United States,* 556 F.2d 903, 905 (8th Cir.1977). *See also Schulthess v. United States,* 694 F.2d 175 (9th Cir.1982) (no district court jurisdiction where equitable relief sought is dependent upon, and must be preceded by, an award of damages).

Nor do we find any merit in the government's contention that because a 1972 amendment to the Tucker Act permits

---

claim, if valid at all, is contractual in nature and exceeds $10,000, their exclusive remedy is in the Court of Claims. Thus, the District Court did not have jurisdiction to issue a declaratory judgment." 690 F.2d at 334. Despite this statement, the Court of Appeals clearly decided the constitutional claim on the merits. Thus, it is difficult to discern what rule the *Chu* court applied. It is clearly not the rule the government cites it for, and therefore their reliance is misplaced.

7. The Supreme Court has implicitly sanctioned such a procedure. *Compare Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (reversing a district court denial of declaratory judgment that plaintiff's discharge from Navy was illegal) *with Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964) (reversing Court of Claims' subsequent denial of back pay). *See also Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595 (1978).

the Claims Court, to "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records," 28 U.S.C. § 1491, plaintiffs *must* bring their entire suit in the Claims Court. Even assuming, as the government contends, that this amendment would permit the Claims Court to give plaintiffs substantially all the relief they seek, we agree with Judge Weinstein in *Melvin v. Laird,* 365 F.Supp. 511 (E.D.N.Y.1973) that "only in the face of the clearest of Congressional intentions could the powers of this court to come to grips with claims of [constitutional] dimension be ousted by the availability of monetary relief from the Court of Claims." 365 F.Supp. at 519. (This position is bolstered by the fact that the Claims Court, unlike the predecessor Court of Claims, is not an article III court. *See* Petrowitz, *Federal Court Reform: The Federal Courts Improvement Act of 1982—And Beyond,* 32 Am.U.L.Rev. 543, 558 (1983).) Judge Weinstein convincingly demonstrated that the 1972 amendment was for the benefit of claimants who *desired* to bring both the monetary and nonmonetary aspects of their wrongful discharge claims before the Claims Court. *See generally* S.Rep. No. 1066, 92d Cong., 2d Sess. (1972); H.R.Rep. No. 1023, 92d Cong., 2d Sess. (1972), U.S. Code Cong. & Admin.News 1972, p. 3116. It was not intended to enlarge the area of the Claims Court's exclusive jurisdiction. Conversely, it does not limit the jurisdiction of the district court. *See also Giordano v. Roudebush,* 617 F.2d 511, 514–15 (8th Cir. 1980); *Bruzzone v. Hampton,* 433 F.Supp. 92, 95–96 (S.D.N.Y.1977); *contra, Denton v. Schlesinger,* 605 F.2d 484 (9th Cir.1979); *Cook v. Arentzen,* 582 F.2d 870, 878 (4th Cir.1978). *Cf. Coco Brothers v. Pierce,* 741 F.2d 675 (3d Cir.1984). We conclude that the district court had jurisdiction over plaintiffs' claims for declaratory and injunctive relief.

■■■ We emphasize that today's decision is not in any way intended to derogate from the Claims Court's sphere of exclusive jurisdiction. We have not permitted plaintiffs to create district court jurisdiction over monetary claims exceeding $10,000 by artful pleading. Nor have we permitted the district court to exercise pendent jurisdiction over such claims where they arise from the same facts as nonmonetary claims. *Compare McKay v. United States,* 703 F.2d 464, 470 (10th Cir.1983) (rejecting pendent jurisdiction) *with Woodland Nursing Home Corp. v. Califano,* 487 F.Supp. 9, 12 (S.D.N.Y.1979) (exercising pendent jurisdiction). Nor have we permitted plaintiffs to "split" their causes of action for money damages between the district court and Claims Court. *See Giordano v. Roudebush, supra,* 617 F.2d at 515. We hold only that "[i]f the declaratory or injunctive relief a claimant seeks has significant prospective effect or considerable value apart from merely determining monetary liability of the government, ... the district court may assume jurisdiction over the nonmonetary claims." *Minnesota by Noot v. Heckler, supra,* 718 F.2d at 858 (footnote omitted).

Because the district court did not have jurisdiction over plaintiffs' monetary claims, we must vacate that portion of the district court's order awarding monetary relief and remand with directions to either permit plaintiffs to amend their complaint to waive damages in excess of $10,000, or to transfer those claims to the Claims Court pursuant to 28 U.S.C. § 1631. The district court did have jurisdiction over the nonmonetary claims, so we must proceed to the merits.

### III.

Though plaintiffs' complaint challenged the denial of constructive service credit as violative of the fifth amendment and as a breach of contract, the district court found it unnecessary to reach these very difficult issues.[8] Relying on *United States v. Lar-*

---

**8.** The government contends that the district court decided that there was a breach of contract. Though, at one point in its decision, the

court did speak of a "contractual entitlement", we do not think that the opinion as a whole can be understood as applying contractual analysis.

*ionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), which it found to be analogous to the present case, the district court held that DOPMA had not affected plaintiffs' entitlement to constructive service credit. Our analysis must begin with a careful review of the facts and holding of *Larionoff.*

In that case, the Supreme Court held that enlisted members of the United States Navy were entitled to a re-enlistment bonus despite the fact that Congress had changed the bonus system before their re-enlistment period began. In order to attract enlisted men with certain specialized skills to stay in the armed services, Congress in 1965 created a Variable Re-enlistment Bonus ("VRB") in addition to the already existing Regular Re-enlistment Bonus ("RRB"). Johnnie S. Johnson, a named plaintiff, agreed to extend his enlistment at a time when the VRB program was in effect and his job skills made him eligible for a VRB. Before he began serving the extended enlistment period, however, Congress in 1974 repealed the RRB and VRB system, and substituted a new Selective Re-enlistment Bonus ("SRB"). The government contended that since VRB's had been abolished before Johnson's re-enlistment period began, he was not entitled to receive a VRB.

In rejecting the government's position, the Supreme Court reasoned:

> The intention of Congress in enacting the VRB was specifically to promise to those who extended their enlistments that a VRB award would be paid to them at the expiration of their original enlistment in return for their commitment to lengthen their period of service. When Johnson made that commitment, by entering an agreement to extend his enlistment, he ... became entitled to receive at some future date a VRB at the award level then in effect (provided that he met the other eligibility criteria). Thus, unless Congress intended, in repealing the VRB

program in 1974, to divest Johnson of the rights he had already earned, and constitutionally could do so, the prospective repeal of the program could not affect his right to receive a VRB, even though the date on which the bonus was to be paid had not yet arrived.

431 U.S. at 878–79, 97 S.Ct. at 2159 (footnote omitted). The Court stated that serious constitutional questions would arise if Congress had such an intent. The Court noted that in view of such problems it could not lightly conclude "in the absence of a clear expression of congressional intent" that by establishing a new bonus system Congress intended to affect the rights of those who had extended their enlistments and become entitled to receive VRB's. 431 U.S. at 879, 97 S.Ct. at 2159.

The Court found no such "clear expression of congressional intent." Nothing in the 1974 Act or its legislative history expressed such an intention. The Court rejected the contention that, because there was a saving provision which expressly preserved the right of *all* service members on active duty as of the effective date of the Act to receive upon re-enlistment the RRB's they would have been entitled to before passage of the Act, the failure to include a similar saving clause as to the VRB's established a congressional intent to abolish VRB's entirely. The Court found that a failure to enact a similar saving provision as to VRB's indicated only that Congress did not intend that VRB's be paid to those service members who re-enlisted after the effective date of the Act. In the absence of a clear expression of congressional intent to the contrary, the Court held that elimination of the VRB's did not affect those service members who had already extended their enlistment and had thereby become entitled to the VRB's.

The district court held that the facts of this case were sufficiently analogous to *Larionoff* to require the same result. Though the district court recognized that

Rather, the phrase "contractual entitlement" appears to express the district court's view that upon signing their scholarship contract, plaintiffs became *statutorily* entitled to constructive service credit.

Congress had not enacted constructive service credit for the purpose of inducing students to enter the Scholarship Program, it found nonetheless that this was in fact an inducement, as "one of the bundle of benefits available and used in promoting the Scholarship Program." Moreover, the district court found that when plaintiffs signed their contracts and were accepted into the Scholarship Program they, like the re-enlistees in *Larionoff,* made a commitment that entitled them to receive this benefit at some future date, provided they met all other eligibility requirements for becoming officers of the PHS Commissioned Corps. The district court gave no weight to the fact that scholarship recipients had other service options, and would not necessarily become officers of the PHS Commissioned Corps, because, the court found, "the final decision was reserved to the Secretary." Because of these similarities, the district court concluded that, as in *Larionoff,* a clear expression of congressional intent would be necessary to deprive plaintiffs of their entitlement. We believe that the district court erred in concluding that this case is within the rule of *Larionoff.*

▇ As we read the applicable statutes, scholarship recipients make *no* commitment to become officers of the PHS Commissioned Corps at the time they enter the Scholarship Program, and the Secretary cannot *make* them serve their obligated time as commissioned officers. In reaching this conclusion, we need not rely on the service options available outside the NHS Corps—private practice in a health manpower shortage area or service under a National Research Service Award—since these alternatives are not likely to be feasible for many participants. Nor do we put much weight on the presence of a "buyout" provision in the scholarship contract; the terms [9] of this provision are so punitive that it can scarcely be called an "option". Rather, we rely principally on the fact that even if the Secretary determines that an

individual shall serve as a member of the NHS Corps, 42 U.S.C. § 254m(b)(1), the choice between commissioned officer status (if eligible) and civil service status belongs to the scholarship recipient, not the Secretary. The Secretary is required to "provide such individual with sufficient information regarding the advantages and disadvantages of service as such a commissioned officer or civilian employee *to enable the individual to make a decision on an informed basis.*" 42 U.S.C. § 254m(b)(2) (emphasis added). "To be eligible to provide obligated service as a commissioned officer in the Service, an individual shall notify the Secretary ... of the individual's *desire* to provide such service as such an officer." 42 U.S.C. § 254m(b)(2) (emphasis added).

Thus, though the Secretary may reject a scholarship recipient for service as a commissioned officer under some circumstances, 42 U.S.C. § 254m(b)(3), the Secretary cannot force anyone to become an officer of the PHS Commissioned Corps who does not *decide* on an *informed basis* that he or she *desires* to become one. This decision is made near the end of a scholarship recipient's professional training, not at the time the scholarship contract is signed. Though perhaps the prospect of receiving constructive service credit if they exercised their option to become commissioned officers, to some extent, induced plaintiffs to make a commitment that limited their future freedom of action, we do not find here anything resembling the *quid pro quo* crucial to the *Larionoff* decision. Here the relationship between the inducement and the commitment is far too attenuated to create an "earned" or "vested" right merely upon the signing of the scholarship contract. The re-enlistees in *Larionoff,* by the act of re-enlisting, had already done all that was required of them by the time VRB's were abolished. After signing their scholarship contracts, plaintiffs here had still to complete their rigorous professional training and apply to become commissioned officers

---

**9.** Recipients who do not fulfill their service obligation are required to pay an amount equal to three times the scholarship received (plus interest at the maximum prevailing rate), pro-rated for any period of service actually performed. 42 U.S.C. § 254o(b).

before they could plausibly be said to have "earned" constructive service credit.

A case closer to *Larionoff* might be presented were there allegations or evidence that any plaintiff class members made their actual commitment to become commissioned officers before DOPMA was enacted. From the beginning, however, plaintiffs' theory has been that they made this commitment upon signing their scholarship contracts. In light of the plain statutory language, we must reject this theory. Thus, the rule of *Larionoff* requiring a clear expression of congressional intent to retroactively "divest" plaintiffs of "earned" rights is not applicable, and on this record plaintiffs are not entitled to judgment as a matter of law based upon that theory.[10]

Even if the *Larionoff* rule were applicable here, we believe that in this case there is a clear expression of congressional intent that persons in plaintiffs' circumstances are *not* to receive constructive service credit. DOPMA contained a saving provision preserving the constructive service credits of persons who had previously received such credits, persons who were participating in programs leading to appointment as an officer in the armed forces and the crediting of years of service, persons who were—on the effective date of DOPMA—already medical or dental officers, or who—on the day before the effective date of DOPMA—were enrolled in the Uniform Service University of the Health Sciences or the Armed Forces Health Professions Scholarship Program. It is conceded that plaintiffs do not come within the express terms of this provision. Given the specificity of this provision, we cannot surmise that the omission of persons who, on the day DOPMA became effective, were participants in the Scholarship Program who had

not yet become commissioned officers, was unintentional or an oversight. Relying again on *Larionoff,* where the Supreme Court found no indication of congressional intent as to VRB's in a saving provision dealing with RRB's, the district court held that "more than a mere negative inference must be shown." Again, we find this case distinguishable from *Larionoff.* There the saving provision for RRB's went much further in preserving RRB rights (preserving them for *all* service members then on active duty) than the plaintiffs (who had already re-enlisted) were seeking with respect to VRB's. Here, however, the rights preserved for the groups explicitly named in the saving provision are exactly what plaintiffs would have us extend to them by construction—no more and no less. Thus, we conclude that the omission of plaintiffs from the saving provision provides a clear expression of congressional intent that they were not to receive constructive service credit.

### IV.

Plaintiffs argue that if, as we have now held, DOPMA eliminates constructive service credit for persons situated as they are, then it violates the equal protection component of the fifth amendment Due Process Clause.[11] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). Government action that discriminates against suspect classes or impinges upon fundamental rights will be upheld only if necessary to achieve a compelling governmental interest. Other actions that treat some persons differently from others, especially in the economic, social welfare, and regulatory fields, receive far less scrutiny and will be upheld if they are rational-

---

**10.** Whether the continued representations, after the enactment of DOPMA, that the named plaintiffs would receive constructive service credit created any *contractual* right is not a question properly before this court at this time. *Cf. Ramey v. United States,* 559 F.Supp. 837 (D.D.C. 1982) (holding that the government was not estopped by such representations).

**11.** In their complaint, plaintiffs also alleged that the elimination of constructive service credit violated Due Process in that, as applied to them, it was impermissibly retroactive. Plaintiffs have not pressed this argument on appeal, and therefore we do not address it.

ly related to a legitimate government purpose. *See Sadler v. Sullivan,* 748 F.2d 820, 824 (3d Cir.1984). It is conceded that the action challenged here should be scrutinized under the "rational basis" test. Plaintiffs have the "heavy burden" of overcoming a presumption of rationality "by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 332–33, 101 S.Ct. 2376, 2387–88, 69 L.Ed.2d 40 (1981). We do not believe that they have met this burden.

Plaintiffs' contention is that Congress denied them equal protection by excluding them from the DOPMA saving provision while *including* persons enrolled in the Uniformed Services University of the Health Sciences or the Armed Forces Health Professions Scholarship Program. As plaintiffs note, the saving provision was intended to ensure, among other things, that

> individuals in programs leading to an appointment which would result in the award of constructive service creditable for computation of basic pay and retired pay would be granted such credit and that it would be creditable for such purposes. This is necessary since such individuals have been counselled regarding these entitlements and have entered these programs, at least in part, because of their existence.

H.R.Rep. No. 1462, 96th Cong., 2d Sess. 148–49 (1980). Plaintiffs argue that, with respect to this purpose, they are identically situated with the groups included in the saving provision, and therefore their exclusion was arbitrary and irrational.

▉ What we have said in section III, *supra,* goes far toward answering plaintiffs' equal protection claim. Though plaintiffs may, to some extent, have been induced to enter the Scholarship Program by the prospect of receiving constructive service credit, at the time of DOPMA's enactment they had yet to *commit* themselves to becoming officers of the PHS Commissioned Corps. In contrast, persons enrolled in the Uniform Services University of the Health Sciences or the Armed Forces Health Professions Scholarship Program are *already* commissioned officers with active duty obligations *during* their training, 10 U.S.C. §§ 2114(b), 2121(c), and may *only* meet their service obligation as commissioned medical or dental officers on active duty, 10 U.S.C. §§ 2114(b), 2123, unless relieved of that obligation by the Secretary, 10 U.S.C. §§ 2115, 2123(d). Thus, we believe that Congress could *rationally* decide that depriving these persons of constructive service credit would be more inequitable than depriving Scholarship Program participants of constructive service credit. Therefore, we must uphold the distinction that Congress chose to make.

### CONCLUSION

For the reasons stated in the foregoing opinion, the judgment of the district court will be vacated and the case remanded for proceedings consistent with this opinion. Plaintiffs' contract and "retroactivity" claims have yet to be adjudicated. The district court would appear to have jurisdiction over the nonmonetary aspects of the retroactivity claim and, if plaintiffs waive any monetary relief exceeding $10,000, jurisdiction over the monetary aspects of the retroactivity and contractual claims as well. If plaintiffs elect not to waive, the monetary claims shall be transferred to the Claims Court pursuant to 28 U.S.C. § 1631.