FAIRVIEW TOWNSHIP, COUNTY OF YORK, COMMONWEALTH OF PENNSYLVANIA and Northern York County Regional Joint Sewer Authority, County of York, Commonwealth of Pennsylvania

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and William Ruckelshaus, Administrator, U.S. Environmental Protection Agency; Thomas P. Eichler, Administrator, U.S. Environmental Protection Agency, Region III, and Greene A. Jones, Director, U.S. Environmental Protection Agency, Region III, Water Management Division; Pennsylvania Department of Environmental Resources, Agent For the U.S. Environmental Protection Agency; and Nicholas Debenedictis, Secretary, Pennsylvania Department of Environmental Resources.

Appeal of NORTHERN YORK JOINT SEWER AUTHORITY and Fairview Township, County of York, Commonwealth of Pennsylvania.

No. 84–5688.

United States Court of Appeals, Third Circuit.

Argued June 11, 1985.

Decided Sept. 23, 1985.

**518**

John E. Childe, Jr. (argued), Dice & Childe, Harrisburg, Pa., for appellants.

David Dart Queen, U.S. Atty., Harry A. Nagle, Asst. U.S. Atty., Lewisburg, Pa., F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Dirk D. Snell, Carl Strass, John T. Stahr (argued), Attys. Dept. of Justice, Washington, D.C. (Gerald H. Yamada, Acting Gen. Counsel, Stephen G. Pressman, Office of Gen. Counsel, U.S.E.P.A., Washington, D.C., of counsel), for appellees.

Before HIGGINBOTHAM, BECKER, Circuit Judges, and COHILL, District Judge.[*]

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal from an order of the United States District Court for the Middle District of Pennsylvania, dismissing, for want of subject matter jurisdiction, an action brought by Fairview Township, Pennsylvania, and Northern York Joint Sewer Authority ("Northern York") against the United States Environmental Protection Agency ("EPA"). The case presents a number of difficult questions concerning the jurisdiction of the district courts to review agency action, where that action results in the refusal to provide federal grant funds that were allegedly promised by law but wrongfully withheld. In particular, we must consider whether the district court had jurisdiction over this action, which appellants brought to compel the Administrator of the EPA to approve Northern York's application for federal financial assistance for the construction of a sewage treatment plant, as against EPA's contention that victory for appellants in this litigation would be tantamount to a money judgment of $14,000,000 against the sovereign, in light of EPA's argument that district courts have no jurisdiction over money claims against the sovereign in excess of $10,000.

Appellants alleged several possible grounds of district court jurisdiction over the suit. First, they brought it as a "citizens' suit," pursuant to 33 U.S.C. § 1365, which authorizes private citizens to sue the Administrator to compel performance of his nondiscretionary duties prescribed by the Clean Water Act. We therefore must determine whether the Administrator was actually under the nondiscretionary duty appellants allege, namely the duty prescribed by 33 U.S.C. § 1299 to approve or disapprove grant applications within forty-five days of receipt from a state agency that has reviewed the applications for their conformability to federal and state law. Appellants also invoke district court jurisdiction under the Federal Mandamus and Venue Act, codified in relevant part at 28 U.S.C. § 1361, and pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, and the federal question statute, 28 U.S.C. § 1331. We must decide not only whether this invocation is proper but also whether district court jurisdiction over appellants' mandamus and APA claims is precluded by the Tucker Act, codified in relevant part at 28 U.S.C. § 1491, which vests exclusive jurisdiction for non-tort money claims against the United States in

---

[*] Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

excess of $10,000 in the United States Claims Court.

The district court interpreted appellants' action as, essentially, an attempt to get money from the government and therefore construed the prayer for relief as a request for money damages.[1] The court then dismissed the action on the ground that money damages are not available as a form of relief under the citizens' suit provision. *Fairview Township v. United States Environmental Protection Agency*, 593 F.Supp. 1311, 1315 (M.D.Pa.1984). The district court therefore did not decide the case on the basis of the principal issues raised by the parties, such as the existence *vel non* of a nondiscretionary duty or the allegedly preclusive effect of the Tucker Act.

We hold that the district court erred in characterizing the citizens' suit as an action for money damages and in dismissing it on that ground. However, we also hold that the Administrator was not under a nondiscretionary duty to review Northern York's grant application within forty-five days and that appellants' citizens' suit must therefore be dismissed since they have alleged no nondiscretionary duty as its basis. Reaching appellants' other jurisdictional claims, we hold that mandamus is, at all events, an inappropriate remedy for this action, but that the district court does have jurisdiction over this action, brought as a suit to review agency action under the APA. In particular, we believe that, if appellants prevail in this suit, they will not, for several reasons, be entitled automatically to the funds that they seek but will be entitled only to a reconsideration of Northern York's application by EPA. We therefore believe that appellants' APA action is not a money claim against the United States, and also that the Tucker Act does not operate to preclude district court jurisdiction. We will therefore remand the case to the district court, so that it may reach appellants' claim that EPA acted in an arbitrary and capricious manner in applying new "affordability guidelines" to Northern York's application. If the district court so determines and no other impediments appear, it will instruct EPA to reconsider Northern York's application along the guidelines that it should have used in 1982.

As the parties' contentions in this case turn on the manner in which EPA reviewed Northern York's grant application and on the applicability of certain statutes and regulations as limitations on the Administrator's discretion, we must first describe the procedure by which municipalities and sewer authorities apply for federal funding of sewage treatment plants.

### I. STATUTORY FRAMEWORK: THE FEDERAL WATER POLLUTION CONTROL ACT GRANT PROVISIONS

The Federal Water Pollution Control Act Amendments of 1972 (Amendments or FWPCA) (codified as amended at 33 U.S.C. §§ 1251 *et seq.* ) were enacted by the 92d Congress as a comprehensive revision of the nation's clean water laws, which had proven inadequate in the fight against water pollution.[2] The FWPCA states as the national goal "that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 1251(a)(1). The heart of the Amendments gives to the Administrator of the EPA the authority to promulgate limits, known as "effluent

---

1. In their prayer for relief, appellants asked the district court for an injunction directing EPA to accept Northern York's application for federal funds.

2. The Federal Water Pollution Control Act Amendments of 1972 became law as Pub.L. No. 92–500, 86 Stat. 816, on October 18, 1972, over the veto of President Nixon. Previous federal legislation against water pollution included the Refuse Act of 1899, c. 425, 30 Stat. 1121; the Federal Water Pollution Control Act of 1948, c.

758, 62 Stat. 155; and 1966 amendments to the 1948 Act, Pub.L. No. 89–753, 80 Stat. 1246. For a review of the sweeping changes which the Amendments brought to the laws against water pollution, *see American Frozen Food Institute v. Train*, 539 F.2d 107, 115–24 (D.C.Cir.1976). The FWPCA has since been amended by the Clean Water Act, Pub.L. No. 95–217, 91 Stat. 1567 (1977), and the Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.L. No. 97–117, 95 Stat. 1623.

standards," on the discharge of pollutants into the nation's navigable waters. 33 U.S.C. § 1251(a)(1). To assist states and municipalities in their task of eliminating the discharge of sewage, Congress authorized federal assistance for the design, planning, and building of sewage treatment plants, providing up to 75 percent of the cost of construction.[3]

Distribution of the funds for sewage treatment plants proceeds by means of a system intended to encourage the states to take responsibility for managing the disposal of sewage. Funds are allocated to the states by a statutory formula estimated to represent the ratio of the costs of construction in each state to that in all the states combined. In 1981, Congress set the total for all the states and territories approximately at 1 and awarded Pennsylvania an allocation of 0.040377.33 U.S.C. § 1285. Each state is responsible for making an inventory of its sewage treatment needs and for ranking its needs in order of priority; both the system by which the state determines priority and the "priority list" itself are subject to review by EPA. 33 U.S.C. §§ 1288, 1296, 1313; 40 C.F.R. § 35.915 (1981); *id.* § 35.2015 (1982).

Under the Amendments, applicants for sewage treatment funds were required to submit proposals for three separate grants in sequence. The first grant, Step I, was for "planning," the detailed study of local sewerage needs and consideration of various alternatives. The Step II grant was for "design," the preparation of blueprints and construction specifications. Step III funds were for actual construction. *See* 40 C.F.R. § 35.903 (1975).[4] The three-step process was further complicated by the fact that funds were often not distributed in lump sums but were disbursed in "segments" or "phases." A step grant might be "phased" over a number of years. A local government or authority might therefore be planning one part of its plan under the Step I grant at the same time that it was designing another part under Step II.

EPA regulations provide that a state can take over much of EPA's task of evaluating grant applications if EPA determines that the state agency is capable of managing the program. Moreover, federal funding is available to assist state agencies in administrative matters. "Delegation agreements" signed by EPA and the state specify which of EPA's duties the state will undertake. To the extent that it is authorized under its delegation agreement, if a state, upon review of a grant application, finds that the applicant meets the relevant requirements of federal and state law, then it "certifies" the grant application to EPA, which then completes the review. *See* 40 C.F.R. §§ 35.1000, 35.1005, 35.1030–2 (1981). The tasks that are delegated to the state agency may vary from state to state, depending on EPA's evaluation of the state's ability to manage the program.

The states can be delegated two tasks that are crucial to this dispute. They can undertake the determination that an applicant has, as required by law, the "legal, institutional, managerial, and financial capability to insure adequate construction, operation, and maintenance of the treatment works." *See id.* § 35.925–5 (1981). A state can also be delegated the evaluation of an applicant's proposed "user charges," referring to the cost to sewer customers of the initial hook-up to the system and of sewer rental thereafter. *See id.* § 35.935–13.

Some tasks, however, cannot be delegated to the states. EPA must itself review the applications to determine if they con-

---

**3.** 33 U.S.C. §§ 1281(g)(1), 1282 (1982). Congress has since reduced the share of federal funding to 55 percent of the cost of construction. *See* 33 U.S.C. § 1282.

**4.** The regulations were amended in 1978 to allow a combined grant for Steps II and III. *See* 40 C.F.R. § 35.903(b) (1979). In the Municipal Wastewater Treatment Construction Grant Amendments of 1981, Pub.L. No. 97–117, 95 Stat. 1623, Congress abolished separate funding for Steps I and II and provided instead for sewer authorities to be reimbursed for the cost of planning and design after disbursement of the construction (Step III) grant. *See* 33 U.S.C. § 1281(l)(1) (1982); 127 Cong.Rec. H9821 (daily ed. Dec. 16, 1981) (statement of Rep. Roe).

form to the standards of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* As part of that review, the Regional Administrator must prepare an Environmental Impact Statement (EIS) if one is necessary. 40 C.F.R. § 35.1030 (1981). EPA also remains responsible for evaluating the applicants' compliance with federal civil rights laws. *Id.*

Having created a framework under which the states take over many of EPA's duties, Congress also created a statutory requirement that EPA complete the task of evaluating an application promptly. In order to "expedite the consideration of grant applications and to eliminate duplication of effort by EPA and the States,"[5] Congress has directed the Administrator to approve or disapprove certified grant applications within forty-five days of receipt from the state. *See* 33 U.S.C. § 1299. The forty-five day requirement of § 1299, however, operates only when a state has been delegated "sufficient authority" to administer the construction grant program. Neither the language of the statute nor its legislative history states specifically what constitutes "sufficient authority." As interpretation of 33 U.S.C. § 1299 is of critical importance in this case, we rescribe it in full as follows:

> Whenever the Governor of a State which has been delegated sufficient authority to administer the construction grant program under this subchapter in that State certifies to the Administrator that a grant applicant meets applicable requirements of Federal and State law for assistance under this subchapter, the Administrator shall approve or disapprove such applications within 45 days of receipt of such application. If the Administrator does not approve or disapprove such application within 45 days of receipt, the application shall be deemed approved. If the Administrator disapproves such application the Administra-

tor shall state in writing the reasons for such disapproval. Any grant approved or disapproved under this section shall be subject to amounts provided in appropriation Acts.

The foregoing summary provides the background for our description of how Northern York's Step III application proceeded through this complex of statutes and regulations, and of the point at which EPA decided that the application could go no further.

## II. FACTS AND PROCEDURAL HISTORY

### A.

In 1973, four Pennsylvania municipalities[6] set up the Northern York to plan for the sewage treatment needs of an area of York County. After determining that construction of a sewerage plant could not proceed without financial assistance from EPA, Northern York decided to apply for federal funding as authorized by the FWPCA. As required by regulations, Northern York applied separately for three different grants, for planning (Step I), design (Step II), and actual construction (Step III) of the plant. EPA approved Northern York's application for a Step I grant in 1976 and its Step II application in 1980. This dispute arises out of EPA's review of Northern York's Step III application.

Northern York's first Step III application was certified by Pennsylvania's Department of Environmental Resources (DER) and submitted to EPA on February 1, 1982. EPA returned the application, disapproved, on March 15. In his disapproval letter, Dennis Capella, Chief of the Pennsylvania Section of EPA, informed DER that the grant proposal was being rejected because "grant request costs included in the application ... are estimates made some time ago and no longer accurate." The application therefore would not meet EPA's "af-

---

**5.** H.Rep. No. 97–270, 97th Cong., 1st Sess. (1981) 15, *reprinted in* 1981 U.S.Code Cong. & Ad.News 2629, 2643.

**6.** The four municipalities are Fairview Township, Newberry Township, Lewisberry Borough, and Goldsboro Borough.

fordability criterion." However, Capella told DER that

> If revised cost estimates are developed which demonstrate that this project is affordable, we would certainly consider for review and approval a recertified application. As before any newly certified application in excess of $5 million should include a project summary and affordability analysis.

App. at 57.

On April 5, 1982, Northern York submitted a revised Step III application to DER for certification. On April 13, DER sent the application to EPA with a letter stating that it had not performed an "affordability analysis":

> Department [DER] preparation of the draft project summary and performance of the affordability analysis, as requested in the March 15 letter, are not delegated actions and therefore, have not been included in this submittal. A copy of a draft affordability analysis has been prepared by the Authority [Northern York] to assist you in your review of this project. The Department has not evalu-

ated nor has made [sic] any judgment on the contents of the analysis.

593 F.Supp. at 1313.[7]

Forty-three days later, on May 26, EPA returned Northern York's application to DER with a letter stating that "the proposed project and associated costs have generated substantial public controversy in the last year" and that "much of this opposition has occurred due to the approximate doubling of the estimated project costs and user charges." App. at 58. EPA offered to mediate between Northern York and several citizens' groups that opposed construction of the sewage plant but concluded that "the extent of the cost increase and the public reaction leave no alternative at this time." App. at 59.[8]

After inconclusive correspondence among EPA, DER, and Northern York,[9] EPA wrote to Northern York on September 2, 1982, stating definitively that the Step III application would not be funded. Northern York and Fairview Township then instituted this action in the United States District Court for the Middle District of Pennsylvania. Appellants initially joined both EPA and DER as defendants.

---

**7.** As explained *infra* note 17, the parties dispute the meaning of "affordability" in this context. Essentially, EPA insists that the term refers to the grant applicant's financial soundness, whereas appellants interpret "affordability" as the ability of sewer customers to afford certain "user charges." We can find no definition of "affordability" as a criterion for review of grant applications in the Administrator's regulations. However, as we explain, *id.*, we do not believe that, in this case, it makes any significant difference which definition of "affordability" is correct.

**8.** The record discloses only that the opposition on the part of the citizens' groups to the proposed treatment plant centered on the justification for the plant and its cost. Attorney Thomas W. Scott, of the Harrisburg law firm of Killian & Gephart, wrote as follows to Mr. George Ames of EPA's Office of Water Program Operations:

> The three areas for EPA consideration which you referenced [sic] (justification for sewering, high cost and the awareness of the public of the high cost) are all treated extensively in the submission. There are no pollution problems in the area to be sewered which justify this project—both ground water and

surface water are free from the effects of septic discharge. The area can be and is being properly served by correctly installed and maintained on-lot systems. . . . This project will waste 16 million dollars of federal money to build a sewage system that's principle [sic] objective and principle [sic] function will be to further and create development in what is presently still a rather sparsely populated area of York County.

App. at 55.

**9.** On June 2, 1982, EPA wrote separately to Northern York, proposing mediation between Norther York and the citizens' groups. App. at 60–61. On June 4, DER wrote to Northern York advising the authority that the Step III application was being "returned unfunded." App. at 126–27. Northern York then wrote to DER requesting department interpretation as to whether EPA's action should be considered a final rejection of the Step III application. By letter of June 27, 1982, DER advised Northern York that "it could be concluded that EPA disapproved the application, although their letter does not specifically say so and no reasons for such disapproval are provided. You should seek advice and guidance from your solicitor in interpreting the EPA response." App. at 129.

Their complaint alleged wrongful denial of the Step III grant application and sought equitable relief, i.e., that the court should direct EPA to accept Northern York's grant application. Appellants' complaint also requested money damages and attorney's fees.

## B.

Northern York and Fairview invoked district court jurisdiction pursuant to the jurisdictional grant in the citizens' suit provision of the FWPCA, 33 U.S.C. § 1365.[10] The part of the citizens' suit provision pertinent to this case, § 1365(a)(2), authorizes suits against the Administrator of EPA "where there is alleged a failure of the Administrator to perform any act or duty which is not discretionary with the Administrator." Appellants contend that the nondiscretionary duty that forms the crux of their citizens' suit is the command of 33 U.S.C. § 1299 that the Administrator approve or disapprove grant applications within forty-five days of receipt from the state. They allege that EPA's letter of May 26, 1982, in which the Director of EPA's Water Management Division informed DER that Northern York's Step III application was being "returned," was neither an approval nor a disapproval, but a non-decision. Therefore, appellants maintain, under the provisions of § 1299, since the Administrator made no timely decision on the application, the Step III proposal was automatically deemed approved on

May 29, after the forty-five-day period had expired.

## C.

The district court initially referred this case to a United States Magistrate with instructions to submit findings and recommendations to the court under the authority of 28 U.S.C. § 636. Relying on our holding in *Allegheny County Sanitary Authority v. United States Environmental Protection Agency*, 732 F.2d 1167 (3d Cir.1984) (hereinafter cited as *ALCOSAN*), that the eleventh amendment barred any claim based on federal or state law that a municipal authority might bring against a state agency, the magistrate recommended that the action be dismissed as to DER. Turning to appellants' suit against EPA, the magistrate concluded that the forty-five day period for EPA action on a certified grant application did not apply to this case. He accepted EPA's argument that § 1299 operates only when a state agency has been delegated all the tasks of certifying a grant application as to all applicable requirements of federal law (except for those which cannot be delegated). DER had never been delegated the task of certifying grant applications as to "affordability,"[11] so that, in the magistrate's view, EPA still retained the responsibility for performing that duty. The magistrate reasoned that, as EPA was still presented with this time-consuming task, the Administrator could not be expected to review Northern York's application within forty-five days. Since the forty-five day requirement of § 1299 was the only nondiscretionary

10. Congress enacted the citizens' suit provision in 1972, primarily to allow private citizens the opportunity of participating in the enforcement of the FWPCA. For example, § 1365(a)(1) authorizes private citizens to bring suit in district court against alleged violators of any effluent standard promulgated in FWPCA or any order issued by EPA to enforce such standard. The aspect of § 1365 that attracted the most attention in Congress was the conferring of standing upon citizens who could demonstrate only injury in fact that was non-economic. As such the citizens' suit provision was a response to the Supreme Court's decision in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), that citizens alleging aesthetic injury

could not bring a suit under the waiver of sovereign immunity provided by the Administrative Procedure Act, 5 U.S.C. §§ 701–06. *See* 118 Cong.Rec. 33,756 (remarks of Rep. Dingell). The Nixon Administration had proposed a provision that would have granted standing to any citizen, regardless of ability to show any injury in fact, even aesthetic injury, but this proposal was rejected by Congress. *See* 1 *A Legislative History of the Water Pollution Control Act Amendments of 1972* at 146.

11. The magistrate accepted EPA's definition of "affordability" as an evaluation of an applicant's financial soundness. App. at 204.

duty which appellants alleged as the basis of their citizens' suit, the magistrate concluded that "plaintiffs have failed to state a claim under 33 U.S.C. § 1365(b)(2)." App. at 212.

### D.

Appellants filed lengthy and detailed objections to the Magistrate's report, and the district court reviewed the entire case *de novo*. The court accepted the magistrate's recommendation that the suit against DER should be dismissed under the authority of *ALCOSAN*.[12] The court then dismissed the suit against EPA as well, but for an entirely different reason from that which the magistrate had recommended. Interpreting this case as, fundamentally, a dispute over money, the court stated its belief that "approval of [Northern York's] grant application[ ] would be tantamount to a money judgment of approximately $14,000,-000." 593 F.Supp. at 1315. Construing appellants' prayer for relief as a request for money damages, the district court relied on the authority of four cases, *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 6, 101 S.Ct. 2615, 2619, 69 L.Ed.2d 435 (1981); *City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1144–46 (E.D.Pa.1982); and *Concerned Citizens of Bushkill Township v. Costle*, 468 F.Supp. 21, 26 (E.D.Pa.1978), *aff'd on other grounds*, 592 F.2d 164 (3d Cir.1979), all of which hold that the FWPCA created no private right of action for money damages. The district court then dismissed the suit for lack of jurisdiction. This appeal followed.

### III. SHOULD THE CITIZENS' SUIT HAVE BEEN DISMISSED BECAUSE IT SOUGHT MONEY DAMAGES?

In our view, the line of cases on which the district court relied does not control this dispute between appellants and EPA. *National Sea Clammers, Kentucky Liquid Recycling*, and *Stepan Chemical* are simply concerned with an entirely different issue. The plaintiffs in those cases did not allege, as appellants do here, that EPA owed them a lump sum of money but had refused to disburse it, and that they were entitled to the funds if the Administrator would only fulfill his duty. Rather, they were seeking to be made whole after incurring costs or suffering injuries as a result of the discharge of pollutants.[13] *See National Sea Clammers*, 453 U.S. at 4–7, 101 S.Ct. at 2618–19 (damage alleged to fishing industry by discharge of sewage into New York Harbor); *Kentucky Liquid Recycling*, 604 F.2d at 1010 (damage to water treatment plant allegedly caused by discharge of toxic chemicals into Ohio River); *Stepan Chemical*, 544 F.Supp. at 1139 (clean-up costs and consequential damages sought because of contamination of Delaware River by alleged illegal dumping of toxic waste).

Nor does reliance on *Bushkill Township* justify dismissal of appellants' suit. In the first place, *Bushkill Township* is clearly distinguishable because the plaintiff Sewer Authority in that case had not complied with the absolute sixty-day notice requirement of 33 U.S.C. § 1365 and as a result had failed to meet even the threshold requirement of a valid citizens' suit.[14] *Bushkill Township*, 468 F.Supp. at 26. Second, in *Bushkill Township* the plaintiff alleged that EPA had refused to disburse federal grant funds after the Administrator had determined that he had improperly ap-

---

**12.** Northern York and Fairview have not appealed from the dismissal of their suit against DER.

**13.** Indeed, the plaintiffs in *Kentucky Liquid Recycling* and *Stepan Chemical* did not even name EPA or the Administrator as a defendant.

**14.** The notice requirement of 33 U.S.C. § 1365 reads in pertinent part as follows:

    (b) No action may be commenced—

      .    .    .    .    .

    (2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator.

proved a proposed sewerage project and that reconsideration of the proposals was necessary. The Administrator's *volte-face* in that case was based on his clearly *discretionary* duties undertaken in evaluating a grant applicant's compliance with all laws and regulations. *Id.* at 25–26. Since the duty which plaintiffs alleged in *Bushkill Township* was discretionary, as a result of which the plaintiffs had no viable citizens' suit at all, *Bushkill Township* simply cannot be instructive for this case. Finally, the plaintiff authority and EPA already had entered into a valid contract for the provision of federal funds, and plaintiff's suit was essentially a claim of money damages for breach of contract. *Id.* at 25. The situation is different in this case, where Northern York and EPA have not yet entered into any contractual obligation, but where appellants allege that Northern York is entitled to approval of its grant application as a matter of law because of the Administrator's failure to perform his statutory nondiscretionary duties.

■ As we read the record, Northern York and Fairview are not seeking recompense for consequential damages for some wrongful act done in the past; rather, they seek funds which the Administrator allegedly controlled but refused to provide. The fact that the Administrator's fulfillment of his alleged statutory nondiscretionary duties might result in the disbursement of federal funds does not justify attaching the label "money damages" to the relief which appellants seek. We therefore hold that the district court erred when it dismissed appellants' citizens' suit because it sought money damages. We now turn to the other possible reason for lack of district court jurisdiction over the citizens' suit, namely the absence of any actual nondiscretionary duty.[15]

## IV. WAS THE ADMINISTRATOR UNDER A NONDISCRETIONARY DUTY TO REVIEW NORTHERN YORK'S APPLICATION WITHIN FORTY–FIVE DAYS OF RECEIPT FROM DER?

■ District court jurisdiction over citizens' suits depends on the existence of a duty alleged to be nondiscretionary with the Administrator; if no nondiscretionary duty exists, then neither can a citizens' suit. 33 U.S.C. § 1365(a). The language of 33 U.S.C. § 1299 provides that the forty-five day requirement operates "[w]henever the Governor of a State ... has been delegated sufficient authority to administer the construction grant program." The viability of appellants' citizens' suit therefore depends on whether DER had "been delegated sufficient authority to administer the ... program" so that the Administrator had a nondiscretionary duty to approve or disapprove the Step III grant application within forty-five days of receipt from DER. EPA maintains that § 1299 is not applicable to this case, because Northern York's application was not and could not be sufficiently certified by the state to trigger the forty-five day requirement.[16]

Neither the language nor the legislative history of the section explains precisely what threshold of delegation constitutes "sufficient authority" on the part of the state. EPA maintains, and its contention is certainly reasonable, that § 1299 would make little sense unless the state had been delegated *all* functions that could be delegated. If § 1299 operates even when EPA retains some otherwise delegable functions, then an absurdity could arise: EPA would be responsible for performing the nondelegated functions, some of which might be very time-consuming, but EPA would also be required to complete its review of the grant application within forty-five days. Thus, EPA contends that appli-

---

**15.** It is well settled that "we [can] affirm the district court on any basis which finds support in the record." *United States v. Maker,* 751 F.2d 614, 627 (3d Cir.1984) (quoting *Bernitsky v. United States,* 620 F.2d 948, 950 (3d Cir.), *cert. de-*nied, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980)).

**16.** This argument was accepted by the magistrate. *See supra,* at 523.

cations, such as Northern York's, without an "affordability analysis" are not completely certified, and EPA must make the analysis itself without regard to the forty-five-day period.

We note that EPA's interpretation of the statute has since become the law due to the promulgation of regulations that deal explicitly with this issue. On May 12, 1982—while Northern York's application was before the Administrator for review—the Administrator published interim final regulations for the enforcement of § 1299. 47 Fed.Reg. 20,462-63 (1982) (to be codified at 40 C.F.R. § 35.2042(2)). The regulations provided that "[w]hen EPA receives a certification covering *all* applicable Federal requirements, the Regional Administrator shall approve or disapprove the grant within 45 days of receipt." *Id.* (emphasis added). In their current form, the regulations state explicitly that the Administrator's duty to review an application within forty-five days applies only "[w]hen EPA receives a certification covering *all delegable* pre-award requirements ...." 40 C.F.R. § 35.2041(2)(i) (1985) (emphasis added).

Northern York has failed to present any convincing explanation as to why EPA's eminently reasonable interpretation of § 1299 should be rejected. We see no reason not to accord the Administrator's construction the deference that is usually owed to the interpretation of statutes by the agencies entrusted with their enforcement. *See Train v. National Resource Defense Council, Inc.,* 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975); *American Frozen Food Institute v. Train,* 539 F.2d 107, 131 (D.C.Cir.1976). *See also Pattern Makers' League of North America v. NLRB,* — U.S. —, 105 S.Ct. 3064, 3075-76, 87 L.Ed.2d 68 (1985); *id.* at — – —, 105 S.Ct. at 3076-77 (White, J. concurring); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

EPA's construction of the statute is, in fact, wholly persuasive given that the absolute forty-five day limit on the review of an application arises by statute once "sufficient authority" has been delegated to a state and the application has been certified by the state. We hold, therefore, that because DER had not been delegated all of EPA's delegable tasks, the Administrator of the EPA was not under a nondiscretionary duty to approve or disapprove Northern York's Step III application within forty-five days,[17] and that, as a result, 33 U.S.C.

---

17. Our holding is based in part on our conclusion that EPA had not delegated to the DER the task of performing an affordability study. This conclusion is consistent with DER's understanding of the tasks delegated to it. *See supra* at 522. Appellants contend, however, that, before we can determine whether DER had "sufficient authority" within the meaning of § 1299, we must determine precisely what constitutes an "affordability study." Appellants insist that an "affordability study" refers to one examining the costs to the sewer customer, such as user charges, whereas EPA interprets such a study as one analyzing the sewer authority's ability to afford the costs of construction, operation, and maintenance of the proposed sewage treatment plant. According to appellants, the difference is crucial because they claim that EPA had promulgated no regulations concerning user charges at the time that their Step III application was submitted. They argue, therefore, that, because no regulations were in effect concerning user charges, DER could not have been expected to certify Northern York's application as to "affordability" in order to invoke the forty-five day requirement of § 1299. Therefore, they argue that no certification as to affordabili-

ty was necessary to trigger EPA's nondiscretionary duty to act upon the application within 45 days.

An examination of the regulations in force at the time Northern York applied does not support appellants' contention. EPA at that time required applicants to submit proposed user charges before an application could be approved. *See, e.g.,* 40 C.F.R. § 35.927-4; *id.* 35.-929-2; *id.* § 35.935-13 (1981). Thus, either EPA or a state to which the duty had been delegated was required by regulations to determine that a project was affordable for users before an application could be approved. As we have concluded, however, DER, by its own admission, had not been delegated this duty. *See supra* at 522. In its May 12, 1982, regulations, EPA established new standards concerning user charges including a requirement that sewer authorities enact a "sewer use ordinance" to permit the selection "of the most cost-effective alternative for wastewater treatment and sludge disposal." 47 Fed. Reg. 20,465 (1982) (to be codified at 40 C.F.R. § 35.2130). These new regulations have no effect on our holding that EPA was under no duty to act on Northern York's application within 45 days.

§ 1299 cannot be the basis for appellants' citizens' suit against the Administrator.[18]

## V. DID THE DISTRICT COURT HAVE JURISDICTION OVER APPELLANTS' MANDAMUS AND APA CLAIMS?

Alternatively, appellants contend that the district court had jurisdiction over this dispute as an action in the nature of mandamus, 28 U.S.C. § 1361, and as an action brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and the federal question statute, 28 U.S.C. § 1331.[19]

On the basis of this jurisdiction, appellants allege that the Administrator acted arbitrarily and capriciously in rejecting their funding application. The ground of this claim is appellants' contention that EPA unlawfully applied new "affordability guidelines" or "updated parameters" when deciding to deny Northern York's Step III application and that the Administrator should be estopped from rejecting the application in reliance on these guidelines. As we understand appellants' contention, Northern York had been preparing its Step III application with a view to conforming to earlier, less onerous "affordability guidelines," and appellants claim that EPA surprised Northern York with the imposition of the new standards.[20] We turn to the jurisdictional question.

---

**18.** We recognize that this disposition of appellants' citizens' suit might be viewed as the magistrate saw it, as dismissal for failure to state a claim upon which relief can be granted. *See supra,* at 523. We believe, however, that it is more properly viewed as a dismissal for lack of jurisdiction, since district courts have jurisdiction over citizens' suits only if plaintiffs allege a duty not discretionary with the Administrator. *See* 33 U.S.C. § 1365.

Because we held that appellants have alleged no nondiscretionary duty as the basis of a citizens' suit, we do not reach the question whether the U.S. Claims Court would have exclusive jurisdiction over this dispute if appellants had been able to maintain a viable citizens' suit under the jurisdictional grant of 33 U.S.C. § 1365. We note that in several cases courts have held that plaintiffs could invoke district court jurisdiction even when the dispute involved a non-tort money claim against the sovereign in excess of $10,-000, when plaintiffs sued under a narrow grant of jurisdiction providing for review of the actions of one specific agency. *See Van Drasek v. Lehman,* 762 F.2d 1065, 1070–71, and 1071, n. 10 (D.C.Cir.1985); *Munoz v. Small Business Administration,* 644 F.2d 1361 (9th Cir.1981) (suit against SBA under 15 U.S.C. § 634(b)(1)); *National Treasury Employees Union v. Campbell,* 589 F.2d 669 (D.C.Cir.1978) (suit based on 5 U.S.C. § 8912 to review action of Civil Service Commission); *Trans-Bay Engineers & Builders, Inc. v. Hills,* 551 F.2d 370, 376–77 (D.C.Cir.1976) (claim based on "sue and be sued" provision on National Housing Act, 12 U.S.C. § 1702); *Ferguson v. Union National Bank,* 126 F.2d 753, 756–57 (4th Cir.1942) (same). *Cf. Portsmouth Redevelopment and Housing Authority v. Pierce,* 706 F.2d 471, 475 (4th Cir.) (42 U.S.C. § 1404(a), a different "sue and be sued" provision, does not trump the Tucker Act because the provision contains no grant of jurisdiction, only a waiver of sovereign immunity), *cert. denied,* —— U.S. ——, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). *But see United States v. City of Kansas City, Kansas,* 761 F.2d 605, 609 (10th Cir.1985) (holding that the Tucker Act precluded district court jurisdiction over a counterclaim brought by the city pursuant to 33 U.S.C. § 1365, alleging that EPA had wrongfully denied federal grant funds).

**19.** The APA is not a grant of jurisdiction to the district courts; it provides a waiver of sovereign immunity by the United States from suits to review agency action and sets forth the remedies which are available in such suits. District court jurisdiction, if it exists, must be found in some other provision, such as the federal question statute. *See Califano v. Sanders,* 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977); *Zimmerman v. United States Government,* 422 F.2d 326, 330 (3d Cir.), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970). The federal question statute, 28 U.S.C. § 1331, provides the district courts with jurisdiction over all civil actions coming under the laws of the United States. This case, presenting as it does the question whether EPA has applied the proper affordability guidelines, *see* discussion *infra,* clearly is an action arising under the federal laws which provide for the funding of sewerage projects, such as 33 U.S.C. § 1281 (general authorization for such finding), and under the regulations that provide for EPA review of grant applications, such as 40 C.F.R. § 35.1000 *et seq.* Validly issued administrative regulations may be treated as laws of the United States for purposes of 28 U.S.C. § 1331. *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3 (3d Cir. 1964).

**20.** We are not in position to explicate this claim in any detail, for it is not fleshed out in the complaint and the case was dismissed on jurisdictional grounds before it could be developed.

■ We may dispose of appellants' claim of mandamus jurisdiction summarily, for relief pursuant to 28 U.S.C. § 1361 is entirely inappropriate to this case. Mandamus as a remedy to compel an executive officer to perform his duty is appropriate only when the applicant lacks any adequate alternative remedy. *Grant v. Hogan*, 505 F.2d 1220 (3d Cir.1974); *see also Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179 (9th Cir.1983). As we explain further in this section, appellants have a remedy under the Administrative Procedure Act.

EPA maintains that district court jurisdiction over appellants' APA claim is precluded by the Tucker Act, codified in relevant part at 28 U.S.C. § 1491.[21] By the Tucker Act, the United States waives its immunity from non-tort money claims against the sovereign, *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), but by the terms of that waiver, vests exclusive jurisdiction for claims exceeding $10,000 in the United States Claims Court. *Hahn v. United States*, 757 F.2d 581, 586 (3d Cir.1985).[22] EPA insists that this suit must be viewed as a monetary claim against the United States because the real purpose behind appellants' action is to force the government to disburse funds.

A number of courts, including this one, have considered various aspects of this vexing problem of jurisdiction over a suit brought to review agency action when that action allegedly resulted in the wrongful denial of federal funds. Concerned about the integrity of the Tucker Act, the courts have developed what may be called the "prime objective" doctrine of Claims Court jurisdiction: if victory for the plaintiff in the suit would be tantamount to a release of the funds in excess of $10,000, then the Claims Court has exclusive jurisdiction over the suit, even if the action is styled as one for injunctive or declaratory relief. Thereby the courts have guarded against the possibility that plaintiffs will evade Claims Court jurisdiction by creative drafting of complaints.[23] The jurisprudence of the Tucker Act does not limit the exclusive jurisdiction of the United States Claims Court to suits against the sovereign for money damages as a result of some past act, but to *"any claim"* in excess of $10,-000. (Emphasis added). According to EPA, this suit is a claim in excess of $10,-000 because appellants will stand to gain $14,000,000 if their application is approved.

EPA is not correct. Appellants' claim under the APA cannot be characterized as a money claim for the simple reason that appellants will not receive the federal funds which they seek even if they prevail in district court on that claim. If the district court resolves appellants' only viable claim in their favor, by concluding that

---

At all events it is a well-pleaded allegation that we are not at liberty to ignore.

**21.** 28 U.S.C. § 1491 reads in pertinent part as follows:

(a)(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

(2) ... In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just....

**22.** The district courts and the United States Claims Court have concurrent jurisdiction over non-tort money claims against the sovereign which do not exceed $10,000. 28 U.S.C. § 1346.

**23.** *See, e.g., Hahn v. United States*, 757 F.2d at 588–89; *New Mexico v. Regan*, 745 F.2d 1318 (10th Cir.1984), cert. denied sub nom., *New Mexico v. Baker*, — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Portsmouth Redevelopment and Housing Authority v. Pierce*, 706 F.2d 471 (4th Cir.), cert. denied, — U.S. —, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Alamo Navajo School Board, Inc. v. Andrus*, 664 F.2d 229 (10th Cir.1981), cert. denied sub nom., *Apachito v. Watt*, 456 U.S. 963, 102 S.Ct. 2041, 72 L.Ed.2d 487 (1982); *Kester v. Campbell*, 652 F.2d 13 (9th Cir.1981); *Bakersfield City School District v. Boyer*, 610 F.2d 621 (9th Cir.1979); *Lee v. Blumenthal*, 588 F.2d 1281 (9th Cir.1979); *Heart of the Valley Metropolitan Sewerage District v. United States Environmental Protection Agency*, 532 F.Supp. 314 (E.D.Wis.1981).

EPA acted in an arbitrary and capricious manner in applying the new affordability guidelines to Northern York's application, the court has the authority only to set aside EPA's disapproval as having been based on improper standards. 5 U.S.C. § 706. Assuming *arguendo* that the application of these standards was unfair, there must have been some other guidelines along which EPA could have properly evaluated Northern York's application. The record does not currently disclose (and appellees do not allege) that Northern York's application would have satisfied these older criteria if EPA had adhered to them. Nor would the district court be competent to assess Northern York's conformability to the proper criteria in the first instance; the necessary expertise is found, of course, in EPA. *See Scenic Hudson Preservation Conference v. Federal Power Commission,* 354 F.2d 608, 620 (2d Cir.1965).

Thus, even if the district were to conclude that EPA improperly applied the new guidelines, that court would only be able to determine which guidelines were the appropriate ones for EPA to use, and to direct EPA to reconsider Northern York's Step III application based on the proper standards. Northern York will still have to convince EPA that its application should have been approved under the proper criteria before it receives any of the federal assistance grant for which it applied.

Moreover, we are not certain, after our review of the record, briefs, and oral argument, that Northern York would automatically have received the federal funds for which it was applying even if EPA had approved its application. According to EPA regulations, 40 C.F.R. § 35.903(a), "the Regional Administrator may not award grant assistance unless … he has made the determinations required by [40 C.F.R.] § 35.925 *et seq.*" In turn, 40 C.F.R. § 35.925, entitled "Limitations on Award," provides *inter alia* that a Step III application must meet the requirements of NEPA, as we noted above, at 520. To ensure the conformability of Step III applications with NEPA, the Regional Administrator must have prepared an EIS or determined that one is not necessary. 40 C.F.R. § 35.925–8. This task cannot be delegated to a state agency. 40 C.F.R. § 35.1030–3.

At oral argument, counsel for EPA expressed uncertainty, as do we, as to whether the preparation of the EIS occurs before, after, or at the same time as the submission of a Step III application to EPA. Tr. of Oral Arg. at 35. Commentary to EPA regulations states that "for NEPA compliance to be most effective, environmental issues must be addressed in conjunction with planning the project, and traditionally that has been done during Step 1." 47 Fed.Reg. 20,452. This remark would suggest that the required environmental impact analysis is usually complete by the time a Step III application is approved or disapproved. On the other hand, the record in this case suggests the opposite; in his May 26, 1982, letter to DER, appellee Greene Jones, Director of the Water Management Division of Region III of EPA indicated that EPA had not yet prepared an EIS as to the proposed Northern York sewage plant even though Northern York had already submitted its Step III application.

Although we cannot say with certainty whether the preparation of the EIS must be completed before a sewage authority's application for federal funds is approved, or whether the approval of such a grant application is conditional, subject to the outcome of the determinations which are nondelegable duties of EPA, we are certain that the outcome of an environmental impact analysis can hardly be a foregone conclusion, and counsel for EPA conceded that preparation of an EIS can be very time-consuming. If appellants must still face the requirement of an EIS or other nondelegable determinations after their application is "approved" by EPA, then their suit against EPA can hardly be considered a money claim.

## VI. *CONCLUSION*

In sum, we hold, that the district court has jurisdiction over this suit under the

Administrative Procedure Act and the federal question statute. For the foregoing reasons, we will remand this case to the district court with directions to determine whether the Administrator acted in an arbitrary and capricious manner in applying new "affordability guidelines" to Northern York's application and in rejecting the application in reliance on those guidelines. *See supra* note 20. If the district court determines that the application of these new criteria was unlawful, it will identify which guidelines EPA should have applied, and it will direct EPA to consider Northern York's application according to such standards. If the district court finds that the application of the new criteria was lawful, it will enter judgment for the defendants.[24]

---

**24.** We will affirm the district court's dismissal of appellants' claims for money damages, since the APA by its own terms, excludes money damages as a form of relief, *see* 5 U.S.C. § 702, and since counsel for appellants concede that these claims exceed $10,000. Brief for Appellants at 10. We note that the district court may also have to decide whether the Tucker Act bars part or all of appellants' APA claim if the federal funding which Northern York sought is no longer available, in which case appellants would have no recourse but to sue for money damages as recompense for the funding that was denied. Congress has reduced the share of federal funding available for sewerage projects and has eliminated some types of projects from eligibility. *See* 33 U.S.C. §§ 1281, 1282.